# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### August 5, 2008 Session

## STATE OF TENNESSEE v. DEMPSEY JACKSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-08463      W. Mark Ward, Judge**

---

**No. W2007-01629-CCA-R3-CD   -   Filed September 3, 2009**

---

Following a jury trial, Defendant, Dempsey Jackson, was convicted of one count of reckless aggravated assault, a Class D felony, and two counts of driving under the influence ("DUI"), a Class A misdemeanor. The trial court sentenced Defendant to three years, six months, for his felony conviction, to be served on probation after serving nine months in confinement in the county workhouse. The trial court merged Defendant's two DUI convictions into one DUI conviction and sentenced Defendant to ninety days in confinement for his misdemeanor conviction. The trial court ordered Defendant to serve his sentences concurrently for an effective sentence of three years, six months. On appeal, Defendant argues (1) that the evidence was insufficient to support his convictions; (2) that the State failed to adequately establish a chain of custody prior to the admission of his blood alcohol test results; (3) that the trial court erred by admitting certain evidence; (4) that the trial court erred in denying his request for a special jury instruction; and (5) that the trial court made an improper comment during closing argument. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Paul J. Springer, Memphis, Tennessee, for the appellant, Dempsey Jackson.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilbur, Assistant Attorney General; William L. Gibbons, District Attorney General; Scot A. Bearup, Assistant District Attorney General; and Vanessa King, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Background

Officer Darnell Gooch, Jr. with the Memphis Police Department testified that he responded to a dispatcher's call regarding an unrelated incident on Bradley Street at approximately 9:00 p.m. on June 29, 2003. Officer Gooch turned east onto Kimball Avenue which was a four-lane street separated by double painted lines. Officer Gooch decelerated to approximately fifteen miles per hour when entering Kimball Avenue and then accelerated to approximately twenty-five or thirty miles per hour. Officer Gooch observed a patrol car on his right parked at a convenience store located across the street from the Kimball Cabana Apartments. Officer Gooch moved his vehicle into the left lane and noticed a blue Cadillac across the street waiting to exit from the Kimball Cabana Apartments' parking lot. A line of cars was stopped behind the Cadillac. Officer Gooch observed a vehicle approaching from the opposite direction. Officer Gooch said that the blue Cadillac slowly turned right onto Kimball Avenue in front of the approaching westbound vehicle and then accelerated to avoid the vehicle. The blue Cadillac drove into Officer Gooch's lane and collided with the front-end of Officer Gooch's patrol car. The force of the collision activated the patrol car's air bags.

Officer Gooch lost consciousness and was later transported to the Regional Medical Center where he spent three days in intensive care. Officer Gooch said that after the accident, he did not have any feeling in his body for approximately three days. Officer Gooch stated that he suffered several contusions and missed several months of work.

Officer Gooch said that he had not yet activated his emergency equipment when he turned onto Kimball Avenue. Officer Gooch said his headlights automatically came on when the engine was started, and they were on at the time of the collision. Officer Gooch stated that Kimball Avenue was lined with street lights. Officer Gooch said that he was driving below the posted speed limit of forty miles per hour at the time of the accident.

On cross-examination, Officer Gooch said that the police department's special traffic investigative unit performed an investigation of the traffic accident on Kimball Avenue. Officer Gooch gave a statement to the investigating officers, but he could not remember whether the statement was written or oral. On redirect examination, Officer Gooch stated that he was not disciplined as a result of the accident. Officer Gooch said that he prevailed in a civil lawsuit against Defendant for damages suffered as a result of the accident and received a settlement check from Defendant's insurance company.

Officer Parz Boyce with the Memphis Police Department testified that he was parked in a marked patrol car at the Quick-Check convenience store at approximately 9:00 p.m. on June 29, 2003. Officer Boyce said that his patrol car was facing Kimball Avenue. Officer Boyce stated that he had just completed responding to a call at the Kimball Cabana Apartments which were located across the street from the convenience store. The convenience store was in the ward to which Officer Boyce was assigned on the night of the offenses. Officer Boyce heard the dispatcher's call concerning an incident on Bradley Street. Officer Boyce was getting ready to respond to the call when he saw a patrol car approaching eastbound on Kimball Avene. Officer Boyce recognized Officer Gooch as the driver of the patrol car.

Officer Boyce stated that as Officer Gooch's patrol car traveled down Kimball Avenue, he observed a blue Cadillac pull into Kimball Avenue "at a pretty good speed." It appeared to Officer Boyce that the Cadillac was headed for the convenience store parking lot where he was parked and had accelerated to avoid another vehicle driving westbound on Kimball Avenue. The Cadillac struck Officer Gooch's patrol car as it traveled eastbound on Kimball Avenue. Based on his training and experience, Officer Boyce estimated that Officer Gooch's patrol car was traveling between thirty-six and forty miles per hour when the collision occurred.

After the collision, Officer Boyce radioed an "officer down" call to the dispatcher and ran to Officer Gooch's patrol car. Officer Boyce noted that the patrol car's air bag had been activated. He could not open the driver's side door and ran to the passenger side. With the assistance of a bystander, Officer Boyce managed to open the passenger side door, cut off Officer Gooch's seat belt, and drag Officer Gooch to the street. Officer Boyce secured Officer Gooch's weapon and then went to assist the driver of the blue Cadillac. Officer Boyce identified Defendant at trial as the person he helped remove from the blue Cadillac. Officer Boyce said that he smelled a strong odor of alcohol about Defendant's person.

Officer Boyce stated that he stayed with Defendant after the emergency personnel arrived at the scene. Officer Boyce said that Defendant told him and two fire department employees that he "had smoked a blunt cigar and drank a forty" of beer. Officer Boyce identified Defendant at the accident scene by his license tag number and from the identification located in Defendant's pocket.

Defendant and Officer Gooch were transported to the hospital in separate ambulances, and Officer Boyce followed in his patrol car. Officer Boyce stated that he still smelled the odor of alcohol after Defendant was placed in a hospital room. Officer Boyce said that Defendant was uncooperative and kept refusing medical assistance. Based on his training and experience, Officer Boyce stated that Defendant was intoxicated at the time of the accident.

On cross-examination, Officer Boyce stated that he discussed the accident with his supervisors, Captain John Washington and Lieutenant Scott Wingate, at the accident scene. Officer Boyce said that he believed that he had seen a forty-ounce bottle of beer in the driver's side floor of Defendant's vehicle after the accident, but he acknowledged that he did not include that information on the arrest ticket. Officer Boyce did not know whether the investigating officers interviewed any of the bystanders about the accident. Officer Boyce said that both Officer Gooch's patrol car and Defendant's vehicle sustained significant front-end damage. Officer Boyce stated that Defendant was placed under arrest for DUI before he was transported to the hospital, and the aggravated assault charge was added at some point after the accident.

Terrence Benton testified that he left his mother's apartment at the Kimball Cabana Apartments at approximately 9:00 p.m. on June 29, 2003. Mr. Benton said that he noticed a blue Cadillac in his rearview mirror as he was backing out of his parking place. Mr. Benton said that the vehicle was traveling faster than normal, and Mr. Benton applied his brakes to keep from hitting the Cadillac. Mr. Benton pulled in behind the Cadillac at the parking lot's exit, and the vehicles remained stopped for approximately thirty to forty-five seconds. Mr. Benton observed a vehicle

approaching westbound on Kimball Avenue, and he said that the Cadillac "just went out to [sic] the traffic." Mr. Benton stated that it appeared to him that the Cadillac was headed for the convenience store located across the street when the Cadillac struck the patrol car.

Mr. Benton pulled out of the apartment complex and parked by the side of the road. Mr. Benton ran to assist Officer Boyce in removing Officer Gooch from the patrol car. Mr. Benton said that he then helped Officer Boyce remove Defendant from his vehicle. Mr. Benton stated that a "loud smell" of alcohol emanated from Defendant's person. Mr. Benton identified Defendant at trial as the individual who was pulled from the blue Cadillac. Mr. Benton said that he gave a statement to the police department by telephone later that night.

On cross-examination, Mr. Benton stated that he assumed Defendant was driving faster than the posted speed limit in the parking lot of the apartment complex because Defendant did not slow down for the speed bumps. He acknowledged, however, that Defendant could have been driving the posted speed limit. Mr. Benton said that he did not see a bottle or other container of alcohol when he was lifting Defendant out of his vehicle. Mr. Benton said that Defendant was not driving over five or ten miles per hour when he entered Kimball Avenue. Mr. Benton said that he told the investigating officer who took his statement on the night of the accident that Defendant "smelled like beer."

Ian Walsh, a paramedic with the Memphis Fire Department, testified that an incident report is completed for each emergency call, and one was generated in connection with Mr. Walsh's response to the traffic accident on Kimball Avenue on June 29, 2003. Mr. Walsh stated that he arrived at the accident scene at approximately 9:21 p.m. and found Defendant alert and oriented as to his circumstances. Defendant told Mr. Walsh that his chest hurt. As required by protocol, Mr. Walsh inserted an intravenous tube into Defendant's arm which was filled with a normal saline solution. Mr. Walsh said that no medication was provided by means of the intravenous tube. Mr. Walsh said that Defendant had a small puncture wound under his chin and redness in the chest area. Defendant told Mr. Walsh that he had been drinking alcohol and smoking marijuana before the accident. Mr. Walsh stated that he detected a smell of alcohol when he initially approached Defendant, and the odor persisted in the ambulance on the way to the hospital.

On cross-examination, Mr. Walsh said that a portion of the incident report was prepared after Defendant was admitted to the hospital. Mr. Walsh stated that Defendant was given ten milliliters of saline through the intravenous tube. Mr. Walsh acknowledged that if a call is in response to a traffic accident, the incident report contains a list of contributing factors, and that "alcohol" was one of the enumerated factors. Mr. Walsh agreed that he did not fill in this portion of the form, instead marking the section "n/a," or not applicable. Mr. Walsh stated that he noted Defendant's suspected alcohol consumption prior to the accident in the narrative portion of his report which was prepared at the hospital.

Detective Angie Lewis with the Germantown Police Department, testified that she was assigned to the Metro DUI Unit in June 2003. Detective Lewis said that on June 29, 2003, she was called to the scene of a traffic accident on Kimball Avenue involving a patrol car and a citizen's

-4-

vehicle. Detective Lewis stood in the crowd for a few minutes next to Defendant who was sitting on the curb. Detective Lewis said that she did not know at that time that Defendant was the driver of the blue Cadillac. Detective Lewis smelled a strong order of marijuana and asked the crowd if anyone was smoking marijuana. Detective Lewis said that Defendant responded that he "had just smoked a blunt." Detective Lewis asked Defendant if he was still smoking marijuana, and Defendant told her, "No." One of the other police officers at the scene told Detective Lewis that Defendant was the citizen driver involved in the accident, and Detective Lewis walked away from Defendant.

In response to the request of the investigating officer at the accident scene, Detective Lewis obtained a search warrant to procure a sample of Defendant's blood. Detective Lewis brought the search warrant and a blood alcohol kit provided by the Tennessee Bureau of Investigation (T.B.I.) to the hospital where she met Sally DiScenza, a forensic nurse with the Memphis Sexual Assault Center. The blood alcohol kit contained an alcohol/toxicology request form with a pre-assigned case number, two vials, and stickers with the pre-assigned number to be placed on the vials after the blood sample was drawn. Detective Lewis verified with the hospital medical staff that Defendant had not been administered any medication since his admittance. Detective Lewis filled out the alcohol/toxicology request form in the kit noting Defendant's name, birth date, and driver's license number. Detective Lewis watched as Ms. DiScenza filled the two vials with Defendant's blood. Detective Lewis labeled the two vials with the pre-assigned number provided on the request form, in this case DUI-11161, and Detective Lewis and Ms. DiScenza signed the alcohol/toxicology request form. Detective Lewis sealed the vials inside the box and placed the box in bubble wrap which was also sealed. Detective Lewis stated that she took the kit immediately to the Metro DUI Unit's evidence room where it was placed in a secured locker.

On cross-examination, Detective Lewis acknowledged that both a blood alcohol test and a drug screen were requested on the form. However, Detective Lewis did not recall whether the T.B.I. had tested for the presence of marijuana in Defendant's blood sample. Detective Lewis stated that the Metro DUI Unit's log book would show if anyone had accessed Defendant's samples of blood after she signed the evidence into the log book.

Sally DiScenza testified that after she filled two vials with Defendant's blood, she immediately handed the vials to Detective Lewis who put the vials into the blood alcohol kit and sealed it. On cross-examination, Ms. DiScenza stated that she personally did not put an identifying mark on the vials, but she signed a form stating the date and time at which she drew the blood samples.

Deputy David Curtis with the Shelby County Sheriff's Department testified that he removed the sealed plastic bag containing Defendant's blood samples from the Metro DUI Unit's secured locker on June 30, 2003, for transportation to the T.B.I. for testing. Deputy Curtis testified that the plastic bag in which the blood alcohol kit was packaged was still sealed when he presented the evidence to the T.B.I.

Special Agent Robert Marshall testified that he is a forensic scientist supervisor with the T.B.I. and a custodian of the T.B.I.'s records. Special Agent Marshall stated that the blood alcohol kit containing Defendant's samples of blood was received by the T.B.I. from Deputy D. M. Curtis at 10:20 a.m. on June 30, 2003. The blood alcohol kit was logged in by Sherice Spradling, a forensic technician with the T.B.I. Special Agent Marshall stated that the paperwork accompanying Defendant's blood samples showed that Ms. Spradling verified that the blood alcohol kit was still sealed, assigned the kit the T.B.I.'s unique number of 0350261, removed the vials of blood, and placed the vials in a sealed refrigerator.

Special Agent Marshall stated that Defendant's blood sample was analyzed on July 21, 2003. The analysis revealed a blood alcohol content of 0.12 percent. Special Agent Marshall said that the saline solution given to Defendant at the accident scene would not have affected his blood alcohol level. Special Agent Marshall said that it was the policy of the T.B.I. not to test for other substances if the request form notes that the only underlying charge is D.U.I., as was the case with the form accompanying Defendant's blood samples, and the blood alcohol level of the sample is 0.10 or above. Special Agent Marshall stated that blood samples are destroyed no sooner than sixty days after testing unless a court order is issued preventing the destruction. Special Agent Marshall stated that Defendant's blood samples were destroyed on January 1, 2004.

On redirect examination, Special Agent Marshall said that Defendant came to the T.B.I.'s offices on July 27, 2004, and obtained a copy of his alcohol toxicology report. On re-cross-examination, Special Agent Marshall acknowledged that Defendant's blood samples had been destroyed before Defendant received a copy of the toxicology report.

## II. Sufficiency of the Evidence

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A. Reckless Aggravated Assault

As relevant to the case <u>sub judice</u>, a person commits the offense of reckless aggravated assault when he or she recklessly commits an assault as defined in Tennessee Code Annotated § 39-13-101(a)(1) with the use of a deadly weapon. T.C.A. § 39-13-102(a)(2)(B). A person commits an assault who "intentionally, knowingly or recklessly causes bodily injury to another." <u>Id.</u> § 39-13-101(a)(1). "Bodily injury" includes an abrasion or bruise. <u>Id.</u> § 39-11-106(a)(2). The term "reckless" refers to a person:

> who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

<u>Id.</u> § 39-11-302(c).

Defendant argues that there was insufficient evidence to support a finding that he was driving recklessly or that he used his motor vehicle as a deadly weapon. Defendant points out that Mr. Benton's testimony concerning the speed at which Defendant was traveling at the time of the collision and whether Defendant waited for the westbound vehicle to pass before pulling out of the parking lot conflicted with Officer Gooch's and Officer Boyce's testimony. Defendant also submits that Officer Boyce testified that at the time of the accident he only charged Defendant with D.U.I.

Inconsistencies in testimony and how those inconsistencies might affect the credibility of the witnesses are left to the jury for resolution. Viewing the evidence in a light most favorable to the state, Officer Gooch and Officer Boyce testified that Defendant pulled out in front of an oncoming vehicle as he attempted to cross four lanes of traffic to reach the convenience store located across the street from the apartment complex. Both officers testified that Defendant accelerated to avoid collision with the westbound vehicle, and Defendant's vehicle then crossed the double lines separating the lanes of traffic and collided head-on with Officer Gooch's patrol car. Officer Boyce and Mr. Walsh testified that they smelled the odor of alcohol emanating from Defendant immediately after the collision, and Defendant admitted to Officer Boyce, Mr. Walsh, and Detective Lewis that he had been drinking and had smoked a blunt of marijuana before operating his vehicle. Officer Gooch stated that he suffered several contusions as a result of the accident.

Tennessee Code Annotated section 39-11-106(a)(5) defines a "deadly weapon" as either:

(A) A firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or

(B) Anything that in the manner of its use or intended use is capable of causing death or serious bodily injury . . . .

Thus, items considered deadly weapons fall into two categories, that is, "'weapons that are deadly per se, such as firearms; and deadly by reason of the manner in which they are used.'" State v. McGouey, 229 S.W.3d 668, 672 (Tenn. 2007) (quoting Morgan v. State, 220 Tenn. 247, 415 S.W.2d 879 (Tenn. 1967)). An item falling into the second category "will only be considered a deadly weapon if the defendant in a particular case actually used or intended to use the item to cause death or serious bodily injury." McGouey, 229 S.W.3d at 674.

This Court has previously held that an accused can be convicted of aggravated assault due to the manner in which the accused operated a motor vehicle. State v. Tate, 912 S.W.2d 785, 787 (Tenn. Crim. App. 1995) (citations omitted). Under the facts presented in this case, we conclude that a rational trier of fact could conclude that Defendant operated his motor vehicle in a manner capable of causing death or serious bodily injury. Based on our review of the record, we conclude that a reasonable trier of fact could conclude beyond a reasonable doubt that Defendant was aware of and consciously disregarded the risk to Officer Gooch caused by his conduct. This disregard constituted a gross deviation from the standard of care that an ordinary person would exercise under the circumstances presented. Defendant is not entitled to relief on this issue.

### B. DUI Conviction

Defendant acknowledges that Officer Boyce and Mr. Walsh testified that they smelled alcohol on Defendant's person, and that Detective Lewis smelled the odor of marijuana. Defendant points out, however, that no alcohol container was introduced into evidence at trial despite Officer Boyce's contention that he saw a forty-ounce beer bottle in Defendant's vehicle after the accident. Moreover, Defendant submits that Mr. Walsh did not list alcohol as a contributing factor to the accident on his incident report, and Detective Lewis was the only person who mentioned the smell of marijuana.

Defendant was convicted under Tennessee Code Annotated section 55-10- 401(a)(1)(2), which states:

> (a) It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, . . . while:
>
>> (1) Under the influence of any intoxicant . . . [.]
>> (2) The alcohol concentration in such person's blood or breath is eight-hundredths of one percent (.08%) or more.

Additionally, the alcohol concentration level in an individual's blood or breath at the time of the offense can not exceed ten-hundredths of one percent (.10%) or more. T.C.A. § 55-10-401(a)(2) (2003) (2002 Tenn. Pub. Acts ch. 855, § 7 substituted "eight-hundredths of one percent (.08 % )" for "ten-hundredths of one percent (.10% )" in (a)(2), effective July 1, 2003, two days after the incident in this case.)

In addition to Officer Boyce's and Mr. Walsh's testimony that they detected the odor of alcohol on Defendant's person, and Defendant's admissions to Officer Boyce, Mr. Walsh, and Detective Lewis that he had been drinking and smoking marijuana before he got behind the wheel of his vehicle, the TBI lab report indicated that Defendant had a blood alcohol level of .12% shortly after he was arrested. This evidence was clearly sufficient for a rational jury to conclude beyond a reasonable doubt that Defendant had driven a vehicle on a public road while he was under the influence of alcohol. Defendant is not entitled to relief on this issue.

## III. Chain of Custody

Defendant argues that the trial court erred in admitting the results of his blood alcohol test because the State failed to establish a proper chain of custody for his blood sample. In support of his argument, Defendant submits that Detective Lewis did not have a present recollection of the time at which she logged Defendant's blood samples into the Metro DUI Unit's log book, that Detective Lewis could not testify that the copy of the implied consent form presented to her at trial during her direct examination was an accurate copy of the form she executed, and that the State did not introduce the Metro DUI Unit's log book into evidence to show that no one had accessed Defendant's blood samples prior to their delivery to the T.B.I.

Before tangible evidence can be admitted into evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody. State v. Kilpatrick, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000). While every possibility of tampering does not have to be excluded, the circumstances must establish a reasonable assurance of the identity and integrity of the evidence. State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000). The chain of custody requirement is "'to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" Id. (quoting State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). It is in the sound discretion of the trial court to determine whether the chain of custody requirement has been satisfied, and the trial court's determination will not be overturned in the absence of a clearly mistaken exercise of that discretion. Kilpatrick, 52 S.W.3d at 87; State v. Holbrooks, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998).

Detective Lewis testified that she was present when Ms. DiScenza drew blood from Defendant's arm into two vials which were obtained from the blood alcohol kit. Detective Lewis labeled the vials pursuant to standard procedures. The vials were placed back into the box and sealed. Detective Lewis testified that she took the packaged vials directly to the Metro DUI Unit's office because the samples were collected at the end of her shift. Detective Lewis logged the samples into the log book and placed the sealed box in the unit's secured lock box. Deputy Curtis testified that he hand-delivered the box with Defendant's blood samples to the T.B.I. Crime Laboratory and testified that the seal was not broken. Special Agent Marshall testified that Ms. Spradling received the sample from Deputy Curtis, verified that the blood alcohol kit was sealed, and assigned a number to the sample which was unique to the T.B.I. Special Agent Marshall received Defendant's blood sample and verified that the information on the tubes matched the information in the accompanying paper work.

As for Detective Lewis' testimony concerning the implied consent form, as way of background, Detective Lewis testified on direct examination that she completed an implied consent form at the hospital recording Defendant's name, date of birth, address, and driver's license number. The consent form has the word "Warrant" written above the boxes indicating whether Defendant consented to the blood test or refused to take the test. The refusal box apparently was initially checked and then erased. The consent box is not checked. A copy of the implied consent form was introduced as an exhibit without objection by Defendant.

On cross-examination, Detective Lewis was asked if the implied consent form was "a true and exact copy" of the form she filled out. Detective Lewis responded, "I assume it is." Detective Lewis observed that the T.B.I. had possession of the original form and that she would have to see the original so that she could compare the copy to it. In a hearing out of the hearing of the jury, the State informed the trial court that Detective Lewis' hesitancy in responding to the question was caused by the hand-written notations on the top of the copy reflecting the indictment number and the case number assigned by the District Attorney General's office. The following colloquy occurred:

| | |
|---|---|
| THE COURT: | Why would anybody want this in anyway? |
| THE STATE: | If [defense counsel] wishes to have [the copy of the implied consent form] withdrawn, then so be it, the State's not going to object. |
| DEFENSE COUNSEL: | Well, that ends the conversation. I think – |
| TRIAL COURT: | All right. Well, let's just show it withdrawn then. |

Defendant argues that Detective Lewis' inability to authenticate the copy of the implied consent form renders her subsequent testimony concerning the blood samples' chain of custody untrustworthy. We observe that the implied consent form was withdrawn at Defendant's request, and the State thus gave up its opportunity to clarify Detective Lewis' testimony on redirect examination. We also observe, as did the trial court, that the implied consent form was not a necessary step in the establishment of the blood samples' chain of custody. In any event, we do not conclude as Defendant urges that Detective Lewis' hesitancy during this brief portion of her testimony cast such a pall of untrustworthiness over all of her testimony that the results of Defendant's blood alcohol test should be found inadmissible.

"Reasonable assurance, rather than absolute assurance, is the prerequisite for admission." Kilpatrick, 52 S.W.3d at 87. Based on our review, we conclude that the trial court did not abuse its discretion in admitting the results of Defendant's blood alcohol test into evidence. Defendant is not entitled to relief on this issue.

## IV. Evidentiary Ruling

Defendant argues that the trial court erred in allowing a sample blood alcohol kit to be introduced as an exhibit at trial over his objection. On direct examination, Detective Lewis explained the procedures used in drawing a suspect's blood sample and used a sample blood alcohol kit to demonstrate the process during her testimony. At the end of this line of questioning, the State sought admission of the blood alcohol kit as an exhibit at trial, and Defendant objected on relevancy grounds. The trial court found that the blood alcohol kit was relevant to the chain of custody issue and informed the jury:

> I'm going to allow [the blood alcohol kit] into evidence, of course, with the understanding this is not the actual blood kit in this case. This is just to give you an example of the procedures that are utilized.

The admission of demonstrative evidence is within the sound discretion of the trial court. State v. Delk, 692 S.W.2d 431 (Tenn. Crim. App. 1985); State v. Wiseman, 643 S.W.2d 354, 365 (Tenn. Crim. App. 1982). In our view, the trial court did not abuse its discretion in admitting the sample blood alcohol kit. Moreover, the trial court instructed the jury that the blood alcohol kit was not the kit used in drawing the samples of Defendant's blood and was to be used only for demonstrative purposes. The jury is presumed to follow the instructions of the court. See State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004) (citations omitted). Defendant is not entitled to relief on this issue.

## V. Special Jury Instruction

Defendant argues that the trial court erred in denying his request for a special instruction to the jury on the State's duty to preserve evidence. Defendant submits that such an instruction was appropriate because the box containing the two vials, as well as the vials, were destroyed before Defendant had an opportunity to examine them.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). As such, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. See Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194 (1963). In State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), our supreme court concluded that the critical inquiry in a defendant's challenge based on lost or destroyed evidence is whether a trial conducted without the evidence would be fundamentally fair. Id., 2 S.W.3d at 914.

In resolving the question of fundamental fairness, a court must first determine whether the State had a duty to preserve the lost or destroyed evidence. Id. at 917; see also State v. Coulter, 67 S.W.3d 3, 54 (Tenn. Crim. App. 2001). "Generally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R .Crim. P. 16, or other applicable law." Ferguson, 2 S.W.3d at 917. However,

[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Id. (quoting California v. Trombetta, 467 U.S. 479, 488-89, 104 S.Ct. 2528 (1984)). Only if the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty must a court turn to a balancing analysis involving consideration of the following factors: "1. The degree of negligence involved; 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and 3. The sufficiency of the other evidence used at trial to support the conviction." Id. (footnote omitted).

Defendant does not suggest in his brief how the vials and the box in which the vials of blood were transported would have provided exculpatory evidence. As the trial court observed at the hearing on its proposed jury instructions, it was not the absence or presence of the box that was critical, "it's the credibility of these witnesses that have testified" about the chain of custody.

Defendant did not offer any evidence at trial that the pre-assigned numbers affixed to the vials containing his blood samples had been tampered with or in any manner changed after the vials were sealed inside the box. Special Agent Marshall testified that after the numbers on the vials contained within the blood alcohol kit were verified, the box itself and the outer plastic wrapping were destroyed because they had no significance and were considered a bio-hazard. The test performed on Defendant's blood sample revealed a blood alcohol content of 0.12%. Based on our review, we conclude that Defendant has failed to establish that the box and the vials contained any apparent exculpatory value prior to their destruction. Moreover, Defendant offered no evidence of bad faith in connection with the destruction of the box and vials, and the items were apparently destroyed in conformity with the T.B.I. Crime Laboratory's established procedures. See State v. Gilbert, 751 S.W.2d 454, 460 (Tenn. Crim. App. 1988). Defendant is not entitled to relief on this issue.

## VI. Closing Argument

Defendant argues that the trial court made an improper comment to defense counsel during closing argument to the effect of "how much longer are you going." The parties' closing argument is not in the record. As the State submits, the appellant carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the basis of appeal. State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000) (quoting Tenn. R. App. P. 24(b)). Without a complete and proper record, this Court is precluded from considering the issue. Id. (citing State v. Gibson, 973 S.W.2d 231, 244 (Tenn. Crim. App. 1997)); see also State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993) (when an appellate record does not contain "a transcript of the proceedings relevant to an issue presented for review, or

portions of the record upon which the party relies, an appellate court is precluded from considering the issue"). Accordingly, this issue is waived.

## VII. Issues Raised for the First Time on Appeal

Defendant argues for the first time on appeal that the trial court erred in not declaring a mistrial when the implied consent form was "introduced over [Defendant's] objection" and the trial court "subsequently had to strike the exhibit from evidence when [Detective] Lewis was unable to authenticate the document." Defendant submits that a mistrial was the only remedy when "the crucial piece of evidence" could not be authenticated.

First, we note that the record shows that Defendant did not object to the introduction of the implied consent form as an exhibit during Detective Lewis' direct examination, nor did Defendant request a mistrial when the exhibit was later withdrawn. The issue is thus waived. See Tenn. R. App. P. 36.

Defendant also argues for the first time on appeal that the test results of the analysis of his blood should have been found inadmissible because the samples were drawn more than two hours after his arrest. See, e.g., Tenn. R. App. P. 36; State v. Johnson, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived."). Nonetheless, in support of his argument, Defendant relies on the 2005 amendment to Tennessee Code Annotated section 55-10-406 which added the following language to subsection (a)(1):

> For the results of such tests or tests to be admissible in evidence, it must first be established that all tests administered were administered to the person within two (2) hours following such person's arrest or initial detention.

T.C.A. § 55-10-406(a)(1)(2005). Waiver aside, the two-hour requirement was not in effect at the time that Defendant was arrested in 2003. Compare id. § 55-10-406(a)(1)(2005) with § 55-10-406(a)(1)(2003). Defendant is not entitled to relief on these issues.

## CONCLUSION

After a thorough review of the record, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE